THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DARNISHA SCOTT, Defendant-Appellant.

First District (4th Division)   No. 1—87—0987

Opinion filed March 9, 1989.

Paul P. Biebel, Jr., Public Defender, of Chicago (Vicki Rogers, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Catharine M. Forest, and Kent D. Sinson, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LINN delivered the opinion of the court:

Defendant, Darnisha Scott, was convicted of voluntary manslaughter (Ill. Rev. Stat. 1985, ch. 38, par. 9—2(b)) after a bench trial and sentenced to a seven-year term. She argues on appeal that the evidence failed to prove that her actions were not reasonable and justified in self-defense, that it was improper for the sentencing court to consider a victim impact report, and that the court abused its discretion in sentencing her to seven years' imprisonment.

Chicago police officer Daniel Dixon testified for the State that on March 26, 1986, about 10:20 a.m. he and his partner responded to a call and found defendant and her mother on the sidewalk at an address on West 105th Street in Chicago. Defendant ran toward the police car and stated that she had been at her boyfriend's house that night, that she had argued with her boyfriend, that he had told her

that he was going to get a gun, and that although she did not see the gun, she picked up a knife and stabbed him. Defendant then directed the police to her boyfriend's residence at 10555 South La Salle. However, when they were unable to enter the apartment, they returned to defendant's mother's home and Dixon attempted to telephone the boyfriend. At this point defendant's mother handed him a knife. Later, when Dixon entered the boyfriend's apartment, he found L.C. Godfrey's body. He did not find any weapons or towels near the body. The officer did not observe any injuries to defendant.

Godfrey's mother, Ann Everson, testified for the State that her son did not keep any firearms in their home.

Chicago police officer Gloria Oakes testified for the State that defendant was upset, nervous and was talking in a rambling manner as they sat in the squad car in front of 10555 South La Salle. Defendant told Oakes that her boyfriend had reached for a knife, that they had struggled, and that during the struggle she took the knife and stabbed him. She did not mention a gun in the conversation. She did not observe any injuries to defendant.

It was stipulated that, if called, Dr. T.L. An would testify that he performed an autopsy on Godfrey, that Godfrey had five stab wounds, and that death resulted from multiple stab wounds to the chest and back.

Detective Robert Flood testified for the State that as part of an investigation of the stabbing, he searched Godfrey's home and found a BB gun on a shelf of a dresser in the bedroom adjacent to the bedroom where Godfrey was found. The gun was underneath some clothes, and the room was orderly in comparison to the room where Godfrey was found. The latter room was in disarray. He did not see a green towel anywhere in or near the bedroom where Godfrey was found.

About noon on the date of the incident, Flood interviewed defendant, who stated, after she waived her *Miranda* rights, that she was awakened to the smell of an "embalming fluid" tablet that was burning in an ashtray. She went to the living room, where Godfrey laughed and told her that he thought that would get her up. She then went to the kitchen to get some water, Godfrey followed and they began arguing. She began hitting him and he went to his bedroom and got a gun which he held in his right hand. She then picked up three knives and told Godfrey, "Kill me." Two of the knives fell and Godfrey twisted her left hand so that the remaining knife fell. She then picked up the knife and started cutting him until he fell.

Subsequent to this interview an assistant State's Attorney ar-

rived. Flood again interviewed defendant, and Flood told her that there was no gun found near Godfrey's body. In reply she stated that she had not seen a gun but that Godfrey had a green towel. At approximately 4:30 p.m. defendant was advised of her *Miranda* rights, and she gave a statement which was taken in the presence of a court reporter. In this statement defendant said that after she and Godfrey struggled, he pulled her into the living room and that he had a green towel but she did not know what he had in it. She also said that she thought that he was going to kill her, that she picked up a knife and that she stabbed him two or three times in his chest. He then staggered, grabbed her, and told her not to leave him while she yelled, "Let me go." She then ran to her home. As Flood interviewed defendant, she did not complain of injuries, and he did not observe any injuries to her face, neck, right arm or left hand.

Ruby Rodgers, defendant's mother, testified for defendant that at approximately 10 a.m. she met defendant outside their home and found her vomiting. Defendant asked her to help and to call the police. About 15 minutes later, a police car arrived, and defendant flagged the car down. When defendant and the police returned from driving to Godfrey's home, one of the officers came to Rodgers' home and tried to telephone Godfrey. Defendant was very nervous and upset. Rodgers gave the police a knife that defendant had given her.

Rodgers recalled that she mentioned at about 6:30 p.m. at the police station that defendant needed medical treatment and she was told that defendant would be taken to the hospital. Rodgers claimed that defendant had a bruised neck and a swollen left hand. The next day she saw defendant in court and defendant had a scratch on her arm and a swollen hand. When defendant was released on bail, she was given a cast for her hand.

Rodgers also testified that defendant, who was 17 years old at the time of the stabbing, had dated Godfrey since she was 13 years old. Prior to the incident on March 26, 1986, Godfrey had beaten defendant numerous times. Several months before the incident, Godfrey had injured defendant in a fight that Rodgers did not witness. The police were called, and defendant went to the hospital. On the night before the stabbing Godfrey beat defendant on the street outside her home. Rodgers told the detectives that when defendant came home the next day, she told her that Godfrey had poured embalming fluid on her, straddled her while holding a knife and told her that she was going to die.

Thomas Porter testified for defendant that about 10 a.m. on March 26, he was in front of his home at 10545 South La Salle when

he heard a woman screaming, "Let me go, let me go." A few minutes later he saw defendant leave the building at 10555 South La Salle. She had a knife in her hands, and she told him to call the police.

Roy Barksdale testified for defendant that in March 1986 he saw Godfrey beating defendant on the street.

The court found that defendant was not in danger of death or great bodily harm and did not find that defendant acted in self-defense. The court found that she was seriously provoked into fighting with Godfrey and found her guilty of voluntary manslaughter. A motion for a new trial was denied.

At the sentencing hearing, the State read from portions of the victim's impact statement that Godfrey's mother experienced asthmatic problems, mental anguish, lack of sleep, and blood pressure problems as a result of her son's death; that family members had been attending support groups; that her performance at work and social activity had been affected; that Godfrey had performed work around the house and had helped to support her family; that the grades of the children had suffered; and that the youngest child had to pass defendant's house to attend school and therefore would make excuses not to attend school.

Chicago police officer Charles Harris testified for the State that on November 8, 1986, he arrested defendant for criminal damage to property, and that defendant was very disturbed and violent. He and his partner had to physically restrain defendant and handcuff her. When the complainant entered the room, she cursed him, said that she would kill him, lunged at him and struck him with her fist. Harris, his partner, and two lockup attendants had to again restrain defendant. Later, defendant would not cooperate when they tried to fingerprint her, and four people were needed to return defendant to her cell. Defendant said that she had tried to burn up the business of James Towns by turning over a space heater.

Defendant testified on her own behalf and expressed her remorse for the incident.

Defendant argues that she used deadly force to protect herself from Godfrey, that she was in fear for her life, and that, therefore, her conviction for voluntary manslaughter should be reversed. In support of her self-defense argument, defendant points to the testimony that Godfrey had previously harmed her without the use of a weapon.

■ Voluntary manslaughter is defined as:

> "(b) A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed,

would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable." (Ill. Rev. Stat. 1985, ch. 38, par. 9—2(b).)

Section 7—1 of the Criminal Code of 1961 states:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." Ill. Rev. Stat. 1985, ch. 38, par. 7—1.

■■■ Once self-defense is raised, the State has the burden of disproving it beyond a reasonable doubt. (*People v. Estes* (1984), 127 Ill. App. 3d 642, 651, 469 N.E.2d 275.) When a defendant's statement made outside of court is the only direct evidence of what occurred during the killing, the trier of fact is not required to believe defendant's version. (*People v. Lester* (1981), 102 Ill. App. 3d 761, 766, 430 N.E.2d 358.) There need not be an actual rebuttal of defendant's statement, but only a sufficient showing of circumstances from which defendant's guilt might be concluded by probable deduction. (102 Ill. App. 3d at 766.) The court could consider defendant's conflicting versions in determining the probability of the claim of self-defense. (102 Ill. App. 3d at 767.) The court in a bench trial is to determine the credibility of witnesses and the weight of evidence, and that determination will not be disturbed on review unless palpably erroneous. 102 Ill. App. 3d at 767.

■ Self-defense was raised by the State's evidence of defendant's conflicting statements to the police, and the trial court could have determined that it did not believe that there was a danger of imminent harm to defendant or that defendant reasonably believed that such danger was imminent, which are elements of self-defense. (*People v. Carter* (1985), 135 Ill. App. 3d 403, 409, 481 N.E.2d 1012.) In all the versions defendant gave to the police, there was insufficient evidence of imminent harm: (1) she told Officer Dixon that she stabbed Godfrey after he said he was going to get a gun; (2) she told Officer Oakes that Godfrey had reached for a knife; and (3) she told Detective Flood that she had not seen a gun in Godfrey's possession but only a green towel and that she did not know what Godfrey had wrapped in that towel. Threats alone do not justify the use of deadly force. (*People v. Carbajal* (1978), 67 Ill. App. 3d 236, 241, 384 N.E.2d 824.) And even

if, as claimed in the second version, the knife was seen by defendant as Godfrey reached for it, the trial court could have found her testimony incredible, especially because she told conflicting versions. Defendant's guilt was proven beyond a reasonable doubt.

■ Defendant argues that it was improper for the trial court to consider a victim impact statement at the sentencing hearing because it was not relevant and violated defendant's due process rights. The State argues that this issue was waived. While defendant did not object at trial to the evidence of victim impact and while failure to object to evidence waives the issue on appeal (*People v. Lewis* (1988), 165 Ill. App. 3d 97, 111, 518 N.E.2d 741), the issue of the constitutionality of section 6 of the Bill of Rights for Victims and Witnesses of Violent Crime Act (Ill. Rev. Stat. 1985, ch. 38, par. 1406) can be reviewed under the plain error doctrine. (107 Ill. 2d R. 615(a); see also *People v. Simms* (1988), 121 Ill. 2d 259, 272-73, 520 N.E.2d 308 (*Booth* issue considered under plain error doctrine).) Also, defendant was not required to file a post-sentencing motion. See *People v. Hargis* (1983), 118 Ill. App. 3d 1064, 1083, 456 N.E.2d 250.

■ Section 6 permits a victim of a violent crime to address the sentencing court regarding the impact which defendant's criminal conduct has had upon him. (Ill. Rev. Stat. 1985, ch. 38, par. 1406.) The statute provides that the court shall consider any statements made by the victim in determining the sentence. (Ill. Rev. Stat. 1987, ch. 38, par. 1406.) The Unified Code of Corrections also provides that at the sentencing hearing, the court shall afford the victim of a violent crime the opportunity to make a statement concerning the impact on the victim and to offer evidence in aggravation or mitigation. Ill. Rev. Stat. 1987, ch. 38, par. 1005—4—1(a)(6).

■ Defendant relies primarily upon *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529, which provided that the eighth amendment prohibits, in the sentencing phase of a capital murder trial, the jury's consideration of a victim impact statement. But defendant in the instant case was not eligible to be sentenced to the death penalty, and defendant has not cited noncapital cases in which the victim impact statements made at the sentencing hearing were held prejudicial. And, a trial court's consideration of evidence of victim impact at the sentencing hearing in a noncapital case has recently been upheld as not violative of the eighth amendment of the constitution or the due process clause. (*People v. Hines* (1988), 165 Ill. App. 3d 289, 303, 518 N.E.2d 1362.) Furthermore, unlike the unique situation in *Booth* which created the risk that the jury would impose the death penalty in an arbitrary and capricious manner (*Booth,* 482

U.S. at 502, 96 L. Ed. 2d at 448, 107 S. Ct. at 2532), there is no basis to conclude here that the trial court was unduly influenced by the evidence of victim impact in sentencing defendant. See *People v. Crews* (1988), 122 Ill. 2d 266, 288, 522 N.E.2d 167 (trial judge did not rely on victim impact evidence in sentencing defendant to death).

■ Defendant finally argues that the trial court abused its discretion in sentencing her to seven years' imprisonment because the trial court did not give adequate weight to defendant's history, character, and potential for rehabilitation. The trial court could have sentenced defendant from 4 to 15 years' imprisonment (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(4)), and so her sentence is within the permissible range. Because defendant received a mid-range sentence, we do not see the basis for defendant's argument that it is apparent that the trial court failed to consider defendant's limited education, youth and abusive social background. We cannot say that the trial court abused its discretion in imposing its sentence. *People v. Perruquet* (1977), 68 Ill. 2d 149, 156, 368 N.E.2d 882.

The judgment of the circuit court is affirmed.

Judgment affirmed.

JOHNSON and McMORROW, JJ., concur.