THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
WILLIE MILLER, Defendant-Appellant.

First District (5th Division)   No. 1—86—2296

Opinion filed October 27, 1989.

Michael J. Pelletier and Barbara Kamm, both of State Appellate Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Jane E. Loeb, and William Marback, Assistant State's Attorney, of counsel), for the People.

JUSTICE PINCHAM delivered the opinion of the court:

In counts I and II of the indictment, the defendant, Willie J. Miller, was charged with the offense of murder, in that he on August 10, 1985, without lawful justification (1) intentionally and knowingly shot and killed Albert Johnson, with a gun; and (2) shot and killed Albert Johnson with a gun knowing that such shooting with a gun created a strong probability of death or great bodily harm to Albert Johnson, in violation of sections 9—1(a)(1) and 9—1(a)(2), respectively, of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(1), (a)(2)). Counts III and IV of the indictment similarly charged defendant Miller with the murder of Jimmy Leggett. Defendant Miller waived jury. Following his trial, the trial court found him guilty of the offenses of voluntary manslaughter of Albert Johnson and Jimmy Leggett and sentenced him to a 12 years' imprisonment term on each of the two manslaughter convictions to run consecutively. Defendant Miller contends on this appeal that the trial court erred in imposing consecutive sentences because the two manslaughter offenses were committed as part of a single course of conduct during which there was no substantive change in the nature of the criminal objective, and also, because the victims' deaths were intrinsic, integral ingredients of the man-

slaughter offenses, the victims' deaths therefore could not also be relied on to enhance the penalty for the voluntary manslaughter offenses. Defendant Miller additionally contends on this appeal that the trial court further erred in relying on the impact testimony of one of the manslaughter victim's brother at the sentencing hearing in determining the sentence to impose.

Although the aggregate two consecutive 12 years' imprisonment sentences, 24 years, on the facts of this case revealed by the State's witnesses may not be excessive but indeed may be considered somewhat lenient, the trial court nevertheless clearly lacked authority to impose the consecutive sentences in this case. Accordingly, we vacate the consecutive sentences. The facts and our reasons follow.

At trial, the State's four witnesses, John Robert Dillard, manager and bartender at the Root Inn Lounge, Cynthia Leggett, sister of the decedent victim Jimmy Leggett, Lacy Brown, and Adolphus Robinson established the following events preceding and during the defendant Miller's shooting of the victims, Jimmy Leggett and Albert Johnson.

John Robert Dillard, Lacy Brown, Cynthia Leggett and Jimmy Leggett were in the Root Inn, a tavern, in Chicago, on August 9, 1985, shortly before midnight. Defendant Miller entered the tavern and grabbed Jimmy Leggett. John Dillard came from behind the bar and put defendant Miller out of the tavern. Cynthia Leggett told her brother Jimmy Leggett that he should go home. A few minutes later, Jimmy Leggett left the tavern to go home, promptly followed by John Dillard, Lacy Brown and Cynthia Leggett.

Upon arriving outside the tavern, John Dillard, Lacy Brown and Cynthia Leggett saw Jimmy Leggett and Albert Johnson and defendant Miller engaged in an argument, during which no physical contact was made between them. Defendant Miller pulled a gun from his back and fired once at Albert Johnson, who fell instantly to the ground. Defendant Miller then fired at Jimmy Leggett, who thereafter turned and ran as defendant Miller ran behind him and fired another shot at him. Both Albert Johnson and Jimmy Leggett died from the gunshot wounds to their chests inflicted by defendant Miller.

Adolphus Robinson, another State witness, testified that while he was outside the Root Inn tavern, around midnight of August 6, 1985, he saw defendant Miller take a gun from the blouse of a woman who was in a parked car outside the tavern and place the gun in his pants. Adolphus Robinson immediately departed, but shortly thereafter he heard several shots fired.

The State's evidence established that at the time of his death, Jimmy Leggett had a .14 alcohol level and heroin in his blood. Albert

Johnson also had heroin and a .139 alcohol level in his blood at the time of his death.

Chicago police Detective Ptak, also a State witness, testified that he and his partner arrested defendant Miller about 1:20 p.m. on August 10, 1985, after he was found hiding in a bedroom closet of Rose Bank's apartment. At the police station to which the officers took him, defendant Miller told Detective Ptak that he went into the Root Inn tavern to use the washroom, became involved in an argument with Jimmy Leggett, and was thrown out of the tavern by the manager, John Robert Dillard. Defendant Miller further stated to Detective Ptak that Jimmy Leggett, Albert Johnson and a third person whom he did not know followed him out of the tavern and that the three of them beat and kicked him. The defendant Miller pulled out his gun and fired once at Albert Johnson, then once at Jimmy Leggett, and then once at the third person. Detective Ptak testified that he saw no swelling, abrasion or laceration on defendant Miller's body.

A few hours after the defendant Miller gave Detective Ptak his oral statement, he gave a written statement to Assistant State's Attorney William Connelly, who also testified as a State witness. Defendant Miller's written statement to Assistant State's Attorney Connelly was substantially the same as his oral statement to Detective Ptak, but his written statement was more detailed about his beating. Assistant State's Attorney Connelly also testified that he did not see any bruises or marks on defendant Miller.

Defendant Miller testified as a witness in his own behalf. His version of the incidents was appreciably different from those of the State's witnesses. The defendant stated that he went into the tavern to use the washroom. Defendant Miller insisted that he did not have any contact with Albert Johnson or Jimmy Leggett while in the tavern. Nevertheless, defendant Miller testified that John Dillard, the manager, told defendant Miller to leave the tavern, and the defendant stated that he did so and that John Dillard, Albert Johnson and Jimmy Leggett followed him out. Albert Johnson, Jimmy Leggett and an unknown third man attacked, hit and kicked defendant Miller in his face, groin and back and knocked him to the ground. Defendant Miller stated that he felt one of the three men going for his wallet, and because he feared being robbed, he pulled a gun from his waistband and fired in Jimmy Leggett's direction. As defendant Miller then struggled to his feet, he shot at Albert Johnson. Defendant Miller said that he ran in the same direction that Jimmy Leggett ran, but that he was not chasing Jimmy Leggett; he fired his gun because he thought he was being robbed and that his life was being threatened, and he knew both

Albert Johnson and Jimmy Leggett carried weapons.

■ It was the function of the trial court to determine the facts from the conflicting testimony of the State's witnesses and the defendant. The versions related by the State's witnesses were corroborated and appear to be plausible, while the versions by the defendant appear to be inherently flawed.

First, contrary to the testimony of the State's witnesses, defendant Miller testified that he entered the tavern to use the washroom, and although he stated he did nothing improper and had no contact with anyone in the tavern, John Dillard, the tavern manager, for no reason whatever, nevertheless told him to leave the tavern.

Second, again according to defendant Miller's version but contrary to that of the State's witnesses, Dillard, Albert Johnson and Jimmy Leggett followed the defendant out of the tavern. They did so, if the defendant Miller is to be believed, likewise for no reason whatever.

Third, defendant Miller testified that the three men attacked him, again, if defendant Miller is to be believed, for no reason whatever.

Fourth, defendant Miller's version that he pulled his gun and fired only after he was attacked, beaten, kicked, knocked down, and because he feared he was being robbed is flawed. It would seem that an armed man viciously attacked and robbed by three assailants for no reason would promptly and without hesitation pull his gun to protect and defend himself, rather than wait until after he has been pummeled and beaten to the ground. It would also appear to be unusual that, while being beaten by three assailants, the defendant would initially resort to his gun only after he was beaten to the ground and because he feared being robbed.

Fifth, defendant Miller's testimony that upon getting to his feet, he ran in the same direction that Jimmy Leggett ran, but that he was not chasing Leggett, but that he fired his gun at Leggett because he knew that Leggett carried a weapon and he, the defendant, feared for his life, seemingly is illogical and unreasonable.

As stated, however, it was within the province of the trial court to determine the facts from the State's witnesses and the defendant's contradictory testimony, and the trial court did so. Based upon the cold record, a court of review, without the benefit of hearing and observing the witnesses' demeanor as they testified, could possibly find the facts to be different than the facts found by the trial court in the case at bar. In the factual-legal context of this case, however, this court is mandatorily bound by the trial court's factual findings upon which it predicated its guilty manslaughter findings, as well as the guilty manslaughter findings themselves.

■■ The trial court's guilty manslaughter findings conclusively negated the requisite intent for the offense of murder and, thus, constitute an implied acquittal of the murder charges, and the defendant's conviction of voluntary manslaughter had the effect of an acquittal of the grave charge of murder. (*People v. Kendricks* (1984), 121 Ill. App. 3d 442, 446, 449 N.E.2d 261, 263; *People v. Fox* (1983), 114 Ill. App. 3d 593, 595, 596, 459 N.E.2d 1137, 1140.) From the foregoing controverted testimony, the trial court in the case at bar concluded and found as follows:

"At the outset, I make it very clear, I do not believe the defendant. The defendant is a belligerent, jail house lawyer, tailors his testimony to what he perceives to be legal defenses. The defendant's testimony, therefore, should be considered only where it can be independently corroborated.

The State's evidence in this case, clearly indicates the defendant shot and killed both Leggett and Johnson, who were unarmed.

*Most serious question for the finder of fact, is the question of whether there was, indeed, a scuffle, that is, the defendant testified, immediately preceding the shooting.*

The evidence presented by the State indicates, I would note, that Leggett and Johnson, were intoxicated and under the influence of a morphine derivative.

Secondly, it indicates that Leggett and Johnson, were inside the tavern, but came out soon after the defendant was ejected, giving rise to a possible inference that they followed the defendant.

Thirdly, the court notes that all of the State's witnesses, appeared to be predisposed toward the decedents and against the defendant.

And fourthly, that all of the State's witnesses had been in a tavern, and there is at least a possibility that they were drinking or impaired.

\* \* \*

For the reason I cited, earlier with regard to the State's evidence, and based upon the State's observations, *of the type and character of the State's witnesses*, their interest, bias and prejudice, as well as the reasonableness of their testimony, in light of the Court's own experiences in life, *this Court finds that there was a scuffle between the defendant and the decedents, immediately prior to the incident.*

*Secondly, that the defendant intentionally killed Leggett and*

*Johnson, but that at that time, he unreasonably believed that such actions were justified.*

Accordingly, there is a finding of guilty of voluntary manslaughter of Leggett. Judgment is entered on the finding.

And there is a finding of guilty of voluntary manslaughter of Johnson. Judgment is entered on the ˙finding." (Emphasis added.)

The court set the sentencing for a later date.

We are unable to discern from the record before us "the type and character of the State's witnesses" as stated by the trial court, and we are not benefited by the trial court's more articulate or specific description of them.

■ Parenthetically, we note that the State's witnesses did not testify that "there was a scuffle between the defendant and the decedents, immediately prior to the incident" as the trial court found. This finding by the trial court is expressly predicated on the testimony of the defendant, who also testified that the decedents and the unidentified third man attacked, beat, kicked and knocked him to the ground and attempted to rob him, which was exceedingly more than a mere "scuffle." According to defendant Miller, he was outnumbered and was being violently beaten and robbed when he pulled his gun and fired at his assailants to defend himself against the two forcible felonies that were being committed upon him. Thus, predicated on the defendant's testimonial version of the incident, it would appear that the defendant would have been legally justified and completely exonerated in so defending himself under the provision of section 7—1 of the Criminal Code (Ill. Rev. Stat. 1987, ch. 38, par. 7—1), which provides:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony."

The defendant's version of the double homicide cannot be consistently reconciled with the State's witnesses' contrary versions, which, if believed beyond a reasonable doubt by the trial court, would clearly have established that the double homicides were manifestly cold blood, dispassionate, premeditated murders.

■ It is apparent that the trial court rejected both the State's witnesses' and the defendant's versions and found that the defendant

"unreasonably believed that such actions [of shooting the decedents] was justified." The trial judge neglected to articulate the factual basis or concept upon which he concluded that the defendant, who, according to his version, without provocation was being attacked, beaten, kicked, knocked down and robbed by three assailants, "unreasonably believed" that his actions, in defending himself against such attack and robbery by shooting his assailants, were justified. The trial court, predicated upon its finding and conclusions and exclusively within its province and over which this court is powerless in this case, found that the homicides were voluntary manslaughter.

When the cause came on for sentencing, seven weeks after the trial court's aforesaid factual findings and guilty findings of voluntary manslaughter, the trial court directed counsel:

"On the sole question of eligibility for consecutive sentencing, counsel may argue."

Thereupon, the assistant State's Attorney argued that under section 5—8—4 of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4), the court was empowered to impose a consecutive imprisonment sentence on the two voluntary manslaughter guilty findings and that such a sentence would be appropriate in the case. Conversely, the defense attorney argued just as vociferously that consecutive sentences in the case could not be legally imposed under the aforesaid statutory provision and that consecutive sentences on the two voluntary manslaughter guilty findings would be invalid, improper and inappropriate. Thereupon the trial court stated, found and concluded, which we again set forth in detail because of the necessary materiality to the determination we make of the issues presented on this appeal:

"[I] have considered the arguments of counsel as well as the cases submitted on the issue of consecutive sentencing.

In this case the court will note that *the evidence indicated that the defendant first shot Sonny [Albert Johnson], and that he slumped over, and the defendant then shot Pee Wee [Jimmy Leggett]. Pee Wee then ran some distance and the defendant shot Pee Wee again.*

The State might make I believe an excellent argument that these were two separate and distinct acts by the defendant, all be it [*sic*] *the court found that those acts* which were acts falling under voluntary manslaughter as opposed to murder based upon the fact that defendant intentionally killed both Leggett and Johnson and at *that time he unreasonably believed that such acts were justified:*

* * *

The statute in question provides that the court shall not impose consecutive sentences for offenses which were committed as a part of a single course of conduct during which there was no substantial change in the nature of the criminal objective unless one of the offenses for which the defendant was convicted was a Class X or Class 1 felony, and the defendant inflicted severe bodily injury, in which event the court may enter sentences to run consecutively. The voluntary manslaughter is a Class 1 felony. There were severe bodily injuries. The court will find under any theory, under either theory I should say, that the defendant is eligible to be sentenced consecutively.

* * *

Having considered all the statutory criteria, the court finds that the appropriate sentence in this case is twelve years in the Illinois Department of Corrections for the voluntary manslaughter of Albert Johnson, and I do so sentence you to twelve years in the Illinois Department of Corrections for the voluntary manslaughter of Albert Johnson.

I further find that the appropriate sentence for the voluntary manslaughter of Jimmy Leggett is twelve years in the Illinois Department of Corrections and I do so sentence you to a consecutive term of twelve years in the Illinois Department of Corrections for the voluntary manslaughter of Jim Leggett." (Emphasis added.)

A determination is unnecessary whether the trial court at the sentencing hearing had justified belated misgivings, second thoughts, or ambivalent concerns regarding its guilty manslaughter findings, which prompted a desire to impose a more severe punishment upon the defendant. The defendant correctly argues that the imposition of the consecutive sentence was unlawful because, according to the trial court's aforestated findings, the two manslaughters arose from a single course of conduct without a change in the nature of the criminal objective, and also, because death is an essential element of voluntary manslaughter, the manslaughter death cannot be again relied upon as the required severe bodily harm for the imposition of a consecutive sentence.

■ The supreme court held in *People v. Hicks* (1984), 101 Ill. 2d 366, 462 N.E.2d 473, that the trial court's authority to impose consecutive sentences is limited. Section 5—8—4(b) (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—4(b)) provides that the trial court should not impose consecutive sentences unless the trial court is of the opinion that con-

secutive sentences are required to protect society, and the trial court must set forth in the record the basis for that opinion. Section 5—8—4(a) (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—4(a)) provides:

"The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, in which event the court may enter sentences to run consecutively. Sentences shall run concurrently unless otherwise specified by the court." Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—4(a).

As previously noted, the trial court rejected the State's witnesses' versions of defendant Miller's shooting of the two decedents. Instead, the trial court found that the defendant Miller shot the decedents to defend himself against their beating, kicking and robbery under the unreasonable belief that such shootings were justified. The trial court implicitly found that the defendant's shootings of the decedents were simultaneous acts during a single course of conduct, based upon defendant Miller's unreasonable belief that the shootings were necessary to protect himself from the decedents' attack and robbery.

Again, we parenthetically note that even according to the State's witnesses' versions, which the trial court rejected, the defendant first shot Albert Johnson and then instantaneously shot Jimmy Leggett, who ran as the defendant chased him and fired another shot at him. The defendant's second shot at Jimmy Leggett while chasing him cannot be considered as a "substantial change in the nature of the criminal objective," simply because the uncontradicted evidence established that it was not this second shot that hit or killed Leggett. The evidence established without dispute that Jimmy Leggett was killed, not by a bullet in his back, but rather by defendant Miller's initial fatal shot to his chest. Thus, consistent with the State's rendition, the defendant's fatal shootings of Albert Johnson and Jimmy Leggett were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective.

Likewise, and certainly according to the factual findings of the trial court, the defendant's two fatal shootings of Johnson and Leggett were committed as part of the defendant's single course of conduct during which there was no change, substantial or otherwise, in the nature of the defendant's criminal objective. The trial court found that the defendant unreasonably believed that it was necessary for him to shoot the decedents, a single course of conduct, to protect himself

from harm by them.

The circumstances in the instant case are strikingly similar to those in *People v. Fieberg* (1982), 108 Ill. App. 3d 665, 439 N.E.2d 543. The trial court in *Fieberg* imposed a consecutive sentence on the defendant's aggravated battery and robbery convictions. This court held that the consecutive sentence was improper and pointed out that, although the aggravated battery conviction was based upon (1) the defendant's macing of a police officer, and that the robbery conviction was based upon (2) the defendant's subsequent taking of the officer's gun, both acts were motivated by the same criminal objective of evading capture, and thus, the consecutive sentence was invalid. The *Fieberg* court modified the consecutive sentence to concurrent sentences.

Similarly, defendant Miller shot both decedents on the basis of the same motivation, *i.e.*, to protect himself from the decedents' attack. There was no change in his motivation between his simultaneous shootings.

■■ This court has held that a consecutive sentence is improper even where, unlike here, the time between the acts is not so close and where there are differences in the acts committed by the defendant. In *People v. Parker* (1986), 141 Ill. App. 3d 643, 490 N.E.2d 1076, the victim was accosted by the defendant when he entered her mobile home, pointed a gun at her, and accused her and the man with whom she lived of stealing the defendant's marijuana. The defendant then had the victim write a note to her live-in male friend. She was told that she was going to be held until the defendant's marijuana was returned. When the victim refused to put on a mask, she was hit and threatened. On the basis of these acts, the defendant was convicted of home invasion, armed violence and aggravated kidnapping. The sentences imposed for the home invasion and the armed violence were consecutive. This court modified the consecutive sentence for home invasion and armed violence to concurrent sentences on the ground that the defendant's acts occurred during a single course of conduct and there was no substantial change in the nature of the criminal objective. The court pointed out that the occurrences lasted no more than 10 minutes and in the same place. Although the defendant hit the victim and threatened her, this court held that these acts were committed with the same criminal objective of kidnapping her and that the consecutive sentence was therefore improper.

In *People v. Davis* (1986), 151 Ill. App. 3d 435, 502 N.E.2d 780, this court modified the defendant's consecutive sentence for home invasion and aggravated criminal sexual assault to concurrent sentences.

The defendant in *Davis* forcibly entered the victim's house, raped the victim and then stole her property. This court held that a consecutive sentence was not authorized, since there was no evidence that when the defendant entered the house, he had only the intent to rob the victim and not also to sexually assault her. The court noted that the defendant may have entered with both the objectives of robbing and sexually assaulting the victim.

This same conclusion was reached in *People v. Morgan* (1976), 44 Ill. App. 3d 459, 358 N.E.2d 280, in which the court held that a consecutive sentence for burglary and arson was not authorized where a defendant burglarized a building and then burned it. The *Morgan* court concluded from the evidence that the defendant could have entered the building with the concurrent intent to commit theft and also burn the building. Likewise, in *People v. Baker* (1985), 133 Ill. App. 3d 620, 479 N.E.2d 372, a consecutive sentence on guilty findings of indecent liberties, attempted deviate sexual assault and home invasion was modified to concurrent sentences because there was no showing of a substantial change in the defendant's criminal objective from the commission of the home invasion to the sexual attacks.

■ Because the evidence failed to establish that there was a substantial change in the nature of the defendant's criminal objective during the defendant's course of conduct in the commission of the two manslaughter offenses, the imposition of the consecutive sentence was improper.

■ The trial court imposed the consecutive sentence on the additional ground that defendant Miller's voluntary manslaughter convictions were Class 1 felonies, with severe bodily injuries, namely the deaths of Albert Johnson and Jimmy Leggett. The manslaughter deaths could not be considered the required severe bodily injury for the imposition of a consecutive sentence, because the severe bodily injury of death was also the essential ingredient of the voluntary manslaughter offenses. It is elementary that the same factor once relied on as an essential ingredient of an offense cannot thereafter also be relied on to enhance the penalty for the commission of that same offense.

In *People v. Haron* (1981), 85 Ill. 2d 261, 422 N.E.2d 627, the supreme court reversed an armed violence conviction which was predicated on aggravated battery where the aggravated battery was a felony only because the defendant was armed. The court held that the fact that the defendant was armed could not be used twice: once to raise the offense of battery, a misdemeanor, to an aggravated battery, a felony, and then again used in the armed violence offense, based upon the aggravated battery. This same double enhancement prohibi-

tion of the use of a weapon was applied in reversing the armed robbery/armed violence convictions in *People v. DelPercio* (1985), 105 Ill. 2d 372, 475 N.E.2d 528.

Relying on *Haron*, the supreme court held that it was improper to impose an extended-term sentence on defendant's theft conviction on the basis of a prior theft conviction where that same prior theft conviction had also been used to elevate a misdemeanor theft to a felony theft offense for which defendant was convicted and sentenced to the extended term. (*People v. Hobbs* (1981), 86 Ill. 2d 242, 427 N.E.2d 558.) This court in *People v. Carter* (1984), 129 Ill. App. 3d 1076, 1082, 473 N.E.2d 434, 439, stated that a court may impose extended and consecutive sentences only where there is an independent basis for each enhanced penalty. Thus, this court recognized that the same basis could not be used to impose both an extended-term sentence and also a consecutive sentence.

It is recognized that the prohibition against double penalty enhancement is violated where a trial court considers as aggravation for a greater penalty a factor which is implicit in the offense for which the defendant is being sentenced. In *People v. Conover* (1981), 84 Ill. 2d 400, 419 N.E.2d 906, the supreme court held it was error to consider as aggravation on a theft or burglary sentence the fact that the defendant received compensation from the offense because the taking of proceeds was inherent in these offenses. Thus, this compensation factor had already been considered by the legislature in establishing the sentencing range. This same reasoning has been applied when a sentencing court has considered as aggravation the fact that the defendant threatened harm during an armed robbery because the threat of harm is inherent in an armed robbery. *People v. Rhodes* (1986), 141 Ill. App. 3d 362, 490 N.E.2d 169; *People v. Reid* (1983), 94 Ill. 2d 88, 445 N.E.2d 329.

■■ The trial court's consideration of the victim's death as aggravation in sentencing the defendant was held to be error in *People v. Saldivar* (1986), 113 Ill. 2d 256, 497 N.E.2d 1138, where the defendant was sentenced for the voluntary manslaughter of the victim, and in *People v. Martin* (1988), 119 Ill. 2d 453, 519 N.E.2d 884, where the defendant was likewise improperly sentenced for involuntary manslaughter. The *Saldivar* court explained that it was improper to impose a more severe sentence on the defendant because he caused serious bodily harm, *i.e.*, death, because death is implicit in the offense of voluntary manslaughter and had already been considered by the legislature in establishing the sentencing range for the voluntary manslaughter offense. In imposing a more severe sentence, the *Saldivar*

court held that the trial court may consider "the degree or gravity of the defendant's conduct, *i.e.*, the force employed and the physical manner in which the victim's death was brought about" (*Saldivar*, 113 Ill. 2d at 271, 497 N.E.2d at 1144); however, the *Saldivar* court held that the victim's death could not be considered as aggravation in sentencing.

In applying the principles enunciated in the cases discussed above, it is evident that the trial court's reliance upon the victims' deaths in the instant case to impose a consecutive sentence was error. Obviously, defendant Miller inflicted severe bodily injury because he caused Leggett's and Johnson's deaths, the ultimate of severe bodily injury. However, their deaths were intrinsically factored into his voluntary manslaughter convictions. To again use these deaths to impose a consecutive sentence was improper.

The record before us contains no basis on which the trial court had authority to impose a consecutive sentence. Therefore, defendant Miller's 12 years' imprisonment consecutive sentence must be vacated.

The defendant Miller additionally urges that the trial court erred in relying on the impact testimony of a decedent victim's brother at the sentencing hearing in determining the sentence to impose. In part, because of our ultimate disposition of this issue, we reject the State's contention that the defendant waived this issue on appeal and we decide the issue.

The purpose of the Illinois Bill of Rights for Victims and Witnesses of Violent Crime Act (the Act) is

> "to ensure the fair and compassionate treatment of victims and witnesses of violent crime and to increase the effectiveness of the criminal justice system by affording certain basic rights and considerations to the victims and witnesses of violent crime who are essential to prosecution." (Ill. Rev. Stat. 1987, ch. 38, par. 1402.)

The Act gives the victim of a violent crime the right at sentencing to present a "victim impact statement." (Ill. Rev. Stat. 1987, ch. 38, par. 1406.) A "victim" under the Act includes the actual victim and "the spouse, parent, child or sibling of a person killed as a result of a violent crime perpetrated against the person killed" (Ill. Rev. Stat. 1987, ch. 38, par. 1403(a)(3)), and a violent crime victim's family member may present a statement of the impact that the offense has had and will have on the victim's family. The victim's impact statement is to be considered by the trial court in determining the sentence to impose. Sections 5—4—1(a)(3) and (a)(6) and section 6 (Ill. Rev. Stat., 1986 Supp., ch. 38, pars. 1005—4—1(a)(3), (a)(6), 1406), respectively, provide

in pertinent part as follows:

"[A]fter a determination of guilt, a hearing shall be held to impose the sentence. *** At the hearing the court shall:

\* \* \*

(3) *consider evidence and information offered by the parties in aggravation and mitigation;*

\* \* \*

(6) afford the victim of a violent crime *** committed by the defendant the opportunity to make a statement concerning the impact on the victim and to offer evidence in aggravation or mitigation ***." (Emphasis added.)

And:

"In any case where a defendant has been convicted of a violent crime *** and a victim of the violent crime is present in the courtroom at the time of the sentencing or the disposition hearing, the victim upon his or her request shall have the right to address the court regarding the impact which the defendant's criminal conduct *** has had upon the victim. If the victim chooses to exercise this right, the impact statement must have been prepared in writing in conjunction with the Office of the State's Attorney prior to the initial hearing or sentencing, before it can be presented orally at the sentencing hearing. *The court shall consider any statements made by the victim,* along with all other appropriate factors in determining the sentence of the defendant ***." (Emphasis added.)

The United States Supreme Court held invalid, under the eighth amendment to the United States Constitution, a Maryland statute which allowed the introduction of victim impact evidence as an aggravating factor in a capital sentencing hearing in *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529. The Supreme Court noted that such evidence is often emotionally charged and concluded that its use was inconsistent with the reasoned decision making that is required in sentencing in capital cases. The Supreme Court concluded in *Booth* that the introduction of a victim impact statement in a capital sentencing hearing "creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner" (482 U.S. at 503, 96 L. Ed. 2d at 448, 107 S. Ct. at 2533), and held:

"Allowing the jury to rely on a [victim impact statement] *** could result in imposing the death sentence because of factors about which the defendant was unaware, and that were irrelevant to the decision to kill. This evidence thus could divert the

jury's attention away from the defendant's background and record, and the circumstances of the crime." *Booth*, 482 U.S. at 505, 96 L. Ed. 2d at 449-50, 107 S. Ct. at 2534.

In *People v. Sims* (1988), 121 Ill. 2d 259, 520 N.E.2d 308, the Illinois Supreme Court applied *Booth* and held that "admitting [victim impact] evidence at a capital sentencing hearing clearly violates the defendant's eighth amendment rights," affirmed the conviction but vacated the death sentence and remanded the cause to the trial court for a proper sentencing hearing.

Citing and relying on *Booth*, the Illinois Supreme Court held that sympathy for the defendant's parents is also an inappropriate factor to be considered during the sentencing proceedings in a capital case in *People v. Erickson* (1987), 117 Ill. 2d 271, 303-04, 513 N.E.2d 367, 381.

Applying the reasoning in *Booth* and *Erickson*, this court held that testimony by the victim's mother about her inability to cope with her son's death in ordering a headstone for his grave was an improper factor considered in aggravation on a sentencing hearing in a noncapital case in *People v. Felella* (1987), 163 Ill. App. 3d 1156. The Illinois Supreme Court granted leave to appeal in *Felella* pursuant to Supreme Court Rule 315 (107 Ill. 2d R. 315).

*People v. Felella* (1989), 131 Ill. 2d 525, was decided by the Illinois Supreme Court on September 20, 1989, an analytical review of which is necessary for our resolution of the victim impact testimony sentencing issue before us. After pointing out that the issue in *Felella* was "whether the mother's testimony about the impact of her son's death should have been introduced at the sentencing phase of defendant's trial," the supreme court then noted that, "In *People v. Turner* (1989), 128 Ill. 2d 540, 578, [539 N.E.2d 1196, 1213,] the court held that allowing victim impact evidence in a noncapital sentencing hearing did not *violate that defendant's constitutional rights*." (Emphasis added.) (131 Ill. 2d at 535.) We therefore momentarily turn to *Turner*.

In *Turner*, in which two justices took no part in the consideration or decision of the case and a third justice concurred in part and dissented in part, a jury found the defendant guilty of a capital murder offense and numerous noncapital offenses. After a death penalty hearing before the jury, the defendant was sentenced to death for the capital murder and to varying imprisonment terms for the noncapital offenses. The supreme court vacated the death sentence and remanded for a new death-penalty sentencing hearing because of the improper allowance into evidence during the death-penalty sentencing hearing, via the testimony of a police officer, of the confession of a codefendant which implicated defendant Turner.

.

Turner additionally contended that he was also entitled to a new sentencing hearing for the noncapital offenses on the ground that it was improper at the sentencing hearing to allow the jury to hear the victim's parents' impact statement "and that any such statement violates his eighth amendment and due process rights," citing *Booth.* (*Turner*, 128 Ill. 2d at 578.) The Illinois Supreme Court discussed the United States Supreme Court's statement in *Booth* that "facts about the victim and family also may be relevant in a noncapital criminal trial," and held in *Turner*:

"[A]llowing this statement at the noncapital sentencing hearing did not violate the defendant's constitutional rights. In light of the strong evidence of guilt, *we find that the error in the admission of this evidence was not reversible.*" (Emphasis added.) *People v. Turner* (1989), 128 Ill. 2d 540, 578, 539 N.E.2d 1196, 1213.

Thus, in *Turner* the supreme court expressly recognized and found *"error in admission of this evidence [of the victim's impact statement]"* at the defendant's noncapital offenses sentencing hearing. The supreme court concluded, however, that the error was not reversible error "in light of the strong evidence of guilt."

We now return to *Felella*, in which the Illinois Supreme Court does not address and is completely silent on its foregoing expression in *Turner* of "error in admission of this [victim impact] evidence." The supreme court in *Felella* did, however, reject the defendant's constitutional violation claims thusly:

"Here the Act merely affects a mode of procedure. It simply allows a victim or witness to testify at the sentencing phase of the trial, after the defendant has been convicted. *** [T]he Act does not violate the *ex post facto* provisions of either the United States [citation] or Illinois [citation] Constitution ***.
* * *
Generally, the use of the word, 'shall' is mandatory, but this is not an inflexible rule. [Citation.] Here, the statute is not mandatory in nature. It does nothing to indicate what weight should be given to the 'victim impact' evidence, nor does it indicate what sentence should be imposed. Consequently, the contested language does not impermissibly infringe upon the powers of the court. *Thus, we read the language of section 6 of the Act* (Ill. Rev. Stat. 1985, ch. 38, par. 1406) *as being directory.* *** Accordingly, section 6 of the Act does not violate the separation of powers clauses of the Illinois Constitution." (Emphasis added.) *Felella*, 131 Ill. 2d at 537, 539-40.

From the foregoing language of *Felella*, it is clear that the supreme court did not therein hold that the Act confers absolute unbridled carte blanche authority on the trial court to consider and rely on any and all matters and things contained in a victim impact statement, regardless of and however patently immaterial, irrelevant, improper, prejudicial or inflammatory such matters may be, in determining what sentence to impose. It is clear from *Felella* that the admission of and the trial court's reliance on such evidence under the Act are governed by constitutional due process, fundamental fairness, confrontation, cross-examination, relevancy and materiality principles, and that the validity of the admission of or the trial court's reliance on victim impact testimony in determining a sentence must be evaluated on a case-by-case basis, governed by the facts of each case. Obviously the Act does not relieve the trial court of its solemn responsibility of properly exercising its appropriate discretion in imposing a correct sentence. The language of *Felella*, that "the statute is not mandatory in nature," but "directory" demands this conclusion, and this conclusion is impregnably fortified by the following final language of *Felella*:

> "Defendant next maintains that 'the trial court considered the testimony of the mother which amounted to considering in aggravation a specific element implicit in the offense of voluntary manslaughter.' The State responds that the issue has been waived because the defendant failed to object at trial.
>
> An objection at trial and a written post-trial motion raising the issue are required to preserve that issue for appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186.) Here, the defendant did not object to this evidence at trial, nor did he include it in a written post-trial motion. Consequently, defendant has waived the issue." *Felella*, 131 Ill. 2d at 540.

It is axiomatic that if the supreme court had intended to hold in *Felella* that no restrictions were imposed on the admission of or on the trial court's consideration of victim impact evidence in determining the sentence, the defendant would have no standing to object thereto or to waive same.

We must therefore determine the validity of the admission of the victim impact testimony and the trial court's reliance thereon in imposing sentence in the instant case.

*Felella* decided that the statutory sentencing and victim impact statement language, "shall \*\*\* *consider evidence and information offered by the parties in aggravation and mitigation* \*\*\* afford the victim the opportunity to make a statement concerning the impact on the victim \*\*\*"" and "*the court shall consider any statement made by the*

*victim,*" is directory and does not unconstitutionally mandate the trial court to consider improper and inappropriate evidence in determining the sentence, contrary to the defendant's contention urged before us. See Ill. Rev. Stat., 1986 Supp., ch. 38, pars. 1005—4—1(a)(3), (a)(6), 1406.

The defendant Miller argues that the distinction between a sentencing court's reliance on a victim impact statement at a sentencing hearing in a capital case and a noncapital case is fallacious. He insists that there is absolutely no substantive difference in the logic or reasoning between a judge or jury improperly relying on improper, irrelevant, inflammatory, prejudicial evidence to enhance a penalty to death in a capital case and a judge or jury's similar improper reliance on identical, improper, irrelevant, inflammatory, prejudicial evidence to enhance an imprisonment penalty. In both instances, the defendant contends, both enhanced sentences are predicated on irrelevant, improper, inflammatory and prejudicial matters and concerns. *Felella* resolved these issues adversely to the defendant's contentions.

We decline the defendant's request to distinguish between planned, premeditated, deliberate offenses, such as murder, robbery, burglary, sex offenses, etc., in which, the defendant argues, the offender should and could have anticipated the consequences of his calculated conduct on the victim and the victim's family and should therefore be responsible for such consequences, and the nonpremeditated offense of voluntary manslaughter, of which the defendant is guilty simply because his spontaneous nondeliberate belief of the necessity to kill to protect and defend himself was unreasonable. Thus, the defendant argues, the voluntary manslaughter defendant should not be held accountable for the impact of the victim's death on the victim's family. The defendant argues that the criminality in voluntary manslaughter is the defendant's instantaneous, unreasonable misconception and belief that he must use deadly force to protect himself and that the defendant should therefore not be penalized beyond the commission of that error.

We note that in *People v. Alejos* (1983), 97 Ill. 2d 502, 509, 455 N.E.2d 48, the supreme court significantly stated:

> "Yet no one who commits voluntary manslaughter intends in advance to take a life or employ deadly force; the only 'intent' of this sort that enters into the crime is the decision, arrived at without deliberation and in most cases instantaneously, to use force capable of killing. Before that decision is arrived at, the person who is guilty of voluntary manslaughter typically has no criminal intent whatever. Many such people, including the defendant in this case, make the decision to arm themselves

long before the onset of the passion or misconception which transforms their intentions from peaceful to homicidal; those that arm themselves later do so after the passion or the misconception take hold of them, after which deterrence is no longer possible."

This court, however, in *People v. Scott* (1989), 180 Ill. App. 3d 418, 535 N.E.2d 1113, completely ignored the supreme court's aforementioned *Alejos* voluntary manslaughter distinction. In *Scott*, the defendant was convicted of voluntary manslaughter after a bench trial and sentenced to a seven-year imprisonment term. On appeal, the defendant relied on *Booth* for the proposition that it was improper for the sentencing court to consider a victim impact report. In rejecting the defendant's argument, the *Scott* court stated that, unlike *Booth*, the defendant was not eligible for the death penalty and concluded that "unlike the unique situation in *Booth* which created the risk that the jury would impose the death penalty in an arbitrary and capricious manner [citation], there is no basis to conclude here that the trial court was unduly influenced by the evidence of victim impact in sentencing defendant." *Scott*, 180 Ill. App. 3d at 424-25.

The defendant, in reliance on the Supreme Court's language in *Booth*, finally argues that the trial court's reliance on the victim impact statement in the case at bar resulted in the imposition of a "sentence because of factors about which the defendant was unaware, and that were irrelevant to [his] decision to kill," and improperly "divert[ed the trial court's] attention away from the defendant's background and record, and the circumstances of the crime." *Booth*, 482 U.S. at 505, 96 L. Ed. 2d at 449-50, 107 S. Ct. at 2534.

We conclude that the admission of the victim impact testimony at the sentencing hearing in the case at bar was not erroneous, first, because the victim impact testimony was truly innocuous. Ethelbert Johnson, brother of the deceased victim, Albert Johnson, simply testified, as a family victim impact witness, that he loved his brother. The complete transcript of his victim impact testimony is hereafter set forth as an appendix. Second, there is absolutely no evidence, or even the slightest suggestion or inference, that the trial judge in any way or to any degree relied on the testimony of Ethelbert Johnson in determining and imposing the 12 years' imprisonment sentence for each manslaughter conviction. The maximum penalty for each manslaughter offense was 20 years' imprisonment, yet the trial court imposed an imprisonment sentence of only 12 years for each of these double homicides. Thus, the victim impact testimony was clearly admissible and equally harmless. *People v. Cihlar* (1982), 106 Ill. App.

3d 824, 436 N.E.2d 1041.

██ We perceive no justifiable basis for remanding the cause for resentencing. Thus, we affirm the defendant's judgments of conviction of manslaughter, and we vacate that portion of the judgments requiring that the two 12 years' imprisonment sentences be served consecutively and order that said imprisonment sentences be served concurrently. (*People v. Johnson* (1982), 104 Ill. App. 3d 572, 432 N.E.2d 1232.) Judgments affirmed; consecutive sentences vacated.

Judgments affirmed; consecutive sentences vacated.

MURRAY, P.J., and LORENZ, J., concur.

## APPENDIX

### VICTIM IMPACT TESTIMONY
### DIRECT EXAMINATION
### BY ASSISTANT STATE'S ATTORNEY

"Mr. Miller: Q. Sir, what's your name?

A. Ethelbert Johnson.

Q. Spell your first name.

A. E-T-H-E-L-B-E-R-T

Q. How old are you, sir?

A. Forty-six.

Q. Are you working now?

A. No, I am not. I am on disability. I have a coma.

Q. I ask if you had a brother by the name of Albert Johnson.

A. Yes, I did.

Q. How old was Albert at the time of his death?

A. Forty-eight.

Q. Were you present when Albert was killed?

A. Yes, I was.

Q. And what, if any, effect did that have on you?

A. A great deal.

Q. Can you tell His Honor Judge Getty what effect that had on you?

A. Well, my brother, he was, he is two years older than me. I loved him very dearly. We had our disagreements, but we always enjoyed ourselves when we was together. We drinking, have fun. But knowing how far to go. We did know how far to go. He had a job and he was working for my cousin doing construction work.

Q. How old was he, Albert, at the time of his death?

A. Forty-eight.

Q. You indicated he was working?

A. Yes, he was.

Q. Where was he working?

A. On 45th and, right off, between Shields and Polk Street.

Q. How long had he been working there?

A. He had been working there about two or three years.

Q. Was he working steadily?

A. Yeah.

Q. Did he have any children?

A. No, he didn't.

Q. Was he married?

A. Not to my knowing.

Q. To the best of your knowledge, did your brother have any criminal record?

A. No, he didn't. He been to jail but once for something. It wasn't nothin' to write a big book about.

Q. What, if any, impact did your brother's death have on you and the members of your family?

A. A great deal. Because we all loved him. He never did do no wrong. Just work and mind his own business and drink and went to work. You understand? When he got off work on the weekend, he drinking. He was just enjoying himself, minding his own business. That is the type of fellow he was.

Q. Were you with your brother on the night of his death?

A. I wasn't in the tavern, but I was outside the tavern.

\* \* \*

The man had put him outside the tavern, him and Leggett. I stopped Willie and Leggett from fighting.

\* \* \*

I was in the hospital. I had got hit by a car, the reason why I didn't show, couldn't show. Broke my pelvic bone. I was in the hospital April the 21st. I just got out May the 14th. That's why."