691 N.E.2d 48 (1998)
294 Ill. App.3d 1047
229 Ill.Dec. 112
The PEOPLE of the State of Illinois, Plaintiff-Appellee,
v.
John BIGGS, Defendant-Appellant.
No. 1-96-2043.
Appellate Court of Illinois, First District, Sixth Division.
January 23, 1998.
*49 Michael J. Pelletier, State Appellate Defender, Chicago (Manuel S. Serritos, Asst. Defender, of counsel), for Defendant-Appellant.
Richard A. Devine, State's Atty. of Cook County, Chicago (Renee Goldfarb and William D. Carroll, of counsel), for Plaintiff-Appellee.
Justice GREIMAN delivered the opinion of the court:
Following a jury trial, defendant John Biggs was convicted of first degree murder for the fatal shooting of Terry Chambers and attempted first degree murder for the nonfatal shooting of Anthony Baggett. The trial court sentenced defendant to 40 years on the *50 first degree murder conviction and 20 years on the attempted first degree murder conviction, to be served consecutively. We affirm.
On appeal, defendant raises three issues: (1) whether the trial court abused its discretion in denying defendant's motion for a mistrial based on the testimony of a police detective referring to defendant's record with the police department; (2) whether the imposition of consecutive sentences was proper; and (3) whether defendant is entitled to credit for time served against each of his consecutive sentences.
Terry Chambers and Anthony Baggett were shot at about 1 or 2 a.m. on July 16, 1994. At trial, Baggett, the surviving victim who suffered a gunshot wound to the chest, recounted the shooting incident. In the early morning hours on July 16, 1994, Terry Chambers and Baggett were walking to Baggett's house after purchasing beer at a store when they were approached by two men. Baggett recognized one of the two men as defendant because Baggett had seen defendant around the neighborhood about twice a week for a period of two to three months, previously noticed defendant driving a small white car with a city sticker, and knew him to use the nickname "Pooh Bear."
When the two men encountered Chambers and Baggett, defendant pulled a gun from his waist and started shooting, hitting Baggett in the right side of his chest. Defendant and Baggett stood about four or five feet apart at this time. Chambers began running north and the two men, both of whom had guns, followed Chambers while shooting at him. Baggett went in another direction, toward his house. Baggett testified that when he arrived home, his mother and girlfriend took him to the hospital where he received medical attention and talked to the police.
At the hospital, Baggett told the police that he knew defendant by the nickname "Pooh Bear" and identified the area where defendant hung around. Three days after Baggett returned home from the hospital (July 19), he told the police about the kind of car that defendant drove.
Subsequently, Baggett identified defendant on two occasions: from a photo array on July 20, 1994, and at a lineup on July 27, 1994. Baggett testified that he was positive that defendant was the person who shot him.
Baggett testified that prior to the shooting incident, he and his girlfriend (Kimberly Harris) started drinking beer about 8 or 9 p.m. and he drank three to four 12-ounce beers. Baggett also smoked one cigarette of crack cocaine about the same time (8 or 9 p.m.). By the time of the shooting (1 or 2 a.m.), Baggett felt no effect of the cocaine and beer, and his ability to observe and recall was not affected.
During his trial testimony, Baggett testified that he was currently on home monitoring, a form of parole. Baggett had previously been incarcerated for the offense of possession of controlled substance with intent to deliver and another possession of controlled substance charge.
Kimberly Harris, the girlfriend of Baggett, testified that on the evening before the shootings, she was at Baggett's house with Baggett, Baggett's mother, Baggett's sister, and Chambers. After Baggett and Chambers went to the store to get beer, Harris heard gunshots and then Baggett ran into the house, hollering that he had been shot. Harris, with Baggett's mother and brother, took Baggett to the hospital. Harris did not see anyone, including Baggett, drink liquor during the day or evening of July 15. Harris did not see Baggett use any drugs during that time.
Johnnie Bonner testified that at about 2 a.m. on July 16, 1994, he was sitting on the porch with Chambers, who was a good friend. After Chambers left, Bonner heard gunshots in the distance. Bonner saw a person running but could not identify him. Bonner found Chambers lying face down in the doorway of a church, and he remained when police officers and an ambulance came to the scene.
Bonner testified that he was currently incarcerated on the charge of delivery of a controlled substance and had prior convictions for unlawful use of a weapon by a felon, armed violence, and theft.
Calvin Terry testified that shortly after 2 a.m. on July 16, 1994, he was driving by the *51 church front, noticed the police, stopped and talked to the police. Terry provided Chambers' name and address to the police.
Terry testified that he was currently in prison for a conviction of unlawful use of a weapon by a felon. Terry had prior convictions for unlawful use of a weapon by a felon, possession of controlled substance with intent to deliver, delivery of a controlled substance, and robbery.
Police officer Ricky Galbeth testified that he and his partner were on patrol at about 2 a.m. on July 16, 1994, when they responded to a radio call of a man shot and found Chambers lying in the entrance way of a church. Chambers was not able to speak and had blood on the front of his shirt. Galbeth called for an ambulance and learned that another victim (Baggett) had been shot and taken to the hospital. Galbeth went to the hospital but could not interview Baggett because he was being treated. Later, paramedics, detectives and crime scene investigators arrived at the scene.
Officer Joseph Moran, a forensic investigator, conducted the crime scene investigations, including photographing and collecting the physical evidence at the location where Chambers was found (3507 West Chicago Avenue) and where the shooting began (747 North Trumbull). The locations are less than two blocks apart. Moran testified that Chambers was pronounced dead at the scene and that he found a cartridge case from a 9 millimeter semiautomatic weapon at 747 North Trumball. Moran also recovered a metal fragment that had been removed from Baggett at the hospital.
Detective Thomas McGreal was assigned to investigate the shootings. At the crime scene, Johnnie Bonner and Calvin Terry told McGreal that the murder victim was Chambers. After talking to Baggett and Harris at the hospital, McGreal began looking for a man with the nickname "Pooh Bear" who was reported to live near Trumbull and Chicago Avenues. When McGreal's shift ended the morning of July 16, the investigation was turned over to other detectives.
On July 19, Detective Ralph Vucko was assigned to do a follow-up investigation of the murder and shooting. After talking to Baggett, Vucko looked for defendant, who used the nickname "Pooh Bear," and a vehicle described as a small, two-door white car with a police tow sticker on it that was parked on Trumball. Vucko located the vehicle, picked up Baggett, and drove him past the vehicle. Baggett identified the vehicle, and Vucko proceeded to check the registration for it.
The next day, July 20, Baggett identified defendant from a photo array conducted by Vucko. In his attempt to locate defendant, Vucko went to two different addresses and spoke with two women who identified themselves as defendant's mother and aunt. Neither woman knew where defendant was. Vucko left his business card with them and told them to have defendant contact him if they should see him. Defendant did not contact Vucko. To attempt to locate defendant, Vucko issued a "stop order." When asked what kind of information is contained in a stop order, Vucko replied: "An individual's name, last known address, a birthday, his record number with the police department, and a brief summary of why we would like to talk to him."
Based on Vucko's testimony about the stop order, defense counsel immediately asked for a sidebar and moved for a mistrial. After the trial court denied his motion for a mistrial, defense counsel moved to strike and tell the jury to disregard a portion of Vucko's testimony. The trial court instructed the jury to strike the testimony "regarding a number with the police department."
Officer James Henk testified that he and his partner located defendant at his house (3422 West Chicago Avenue) on July 27, 1994. Defendant told Henk that his nickname was "Pooh Bear," and Henk noticed several tattoos on defendant's left arm, including the name "Pooh Bear." Detective George Tracy testified that on July 27, he conducted a lineup where Baggett "immediately identified the defendant as the person that [sic] shot him and Mr. Chambers."
The parties stipulated that Doctor Choi, a medical examiner, would testify that Chambers died of multiple gunshot wounds to his chest and left leg.
*52 The jury found defendant guilty of the first degree murder of Chambers, the attempted first degree murder of Baggett, and of the aggravated battery with a firearm of Baggett. Following the denial of defendant's motion for a new trial, the trial court sentenced defendant to 45 years in prison for the first degree murder conviction and 30 years for the attempted murder conviction, to be served concurrently. The trial court vacated the aggravated battery conviction because it merged with the greater offense of attempted murder.
Based on the State's motion to reconsider the sentence, the trial court found that consecutive sentences were required. The trial court then sentenced defendant to 40 years in prison on the first degree murder conviction and 20 years on the attempted murder conviction, to be served consecutively. The trial court also awarded defendant 651 days of credit for time served.
On appeal, defendant first asserts that the trial court committed reversible error by denying defendant's motion for a mistrial based on the testimony of a police officer (Vucko) that a stop order includes the individual's "record number with the police department." Defendant argues that this remark was willfully adduced by the prosecution, denied him a fair trial, was overwhelmingly prejudicial to him, and was not adequately cured by the trial court's instructions to the jury.
The State contends that the trial court's action in sustaining defendant's objection to the testimony and instructing the jury to disregard the comment cured any error that may have resulted. The State also argues that the contested comment was not intentionally solicited by the State but rather arose inadvertently.
A mistrial generally should be granted "where there has been an error of such gravity that it has infected the fundamental fairness of the trial, such that continuation of the proceeding would defeat the ends of justice." People v. Sims, 167 Ill.2d 483, 505, 212 Ill.Dec. 931, 658 N.E.2d 413 (1995). On appeal, we will not disturb the trial court's denial of a defendant's motion for a mistrial unless it was a clear abuse of discretion. Sims, 167 Ill.2d at 505, 212 Ill. Dec. 931, 658 N.E.2d 413. Where the trial court admonishes the jury to disregard certain testimony, any possible prejudicial effect to the defendant by the improper testimony can be sufficiently cured. People v. Wiley, 165 Ill.2d 259, 291-94, 209 Ill.Dec. 261, 651 N.E.2d 189 (1995); People v. Speight, 153 Ill.2d 365, 373, 180 Ill.Dec. 97, 606 N.E.2d 1174 (1992); People v. Keen, 206 Ill.App.3d 940, 954-55, 151 Ill.Dec. 652, 564 N.E.2d 1314 (1990). In particular, the error of admitting evidence of other crimes for which defendant is not on trial can be cured when the improper testimony is promptly stricken and the trial court instructs the jury to disregard it. Speight, 153 Ill.2d at 372, 180 Ill.Dec. 97, 606 N.E.2d 1174; People v. Robinson, 254 Ill. App.3d 906, 913, 193 Ill.Dec. 691, 626 N.E.2d 1242 (1993); People v. Rice, 234 Ill.App.3d 12, 18-19, 175 Ill.Dec. 239, 599 N.E.2d 1253 (1992). Jurors are presumed to follow the trial court's instructions. People v. Taylor, 166 Ill.2d 414, 438, 211 Ill.Dec. 518, 655 N.E.2d 901 (1995).
In the present case, the record reveals that the contested remark came after the prosecutor questioned Detective Vucko about his two unsuccessful attempts to locate defendant and his subsequent issuance of a stop order as a police procedure to find people who are being sought:
"Q. Detective, you were saying you utilized a police procedure called a stop order?
A. Yes.
Q. What kind of information is contained in a stop order?
A. An individual's name, last known address, birthday, his record number with the police department, and a brief summary of why we would like to talk to him."
Defense counsel immediately asked for a sidebar and moved for a mistrial. The trial court denied defendant's motion and added, apparently to the prosecutor, "[w]hen I tell you to do a leading question, you do a leading question, and that's it." The trial court was referring to its prior direction to the prosecutor to elicit the information as to the stop order through leading questions.
The record continues as follows:

*53 "MR. COHN [Defense attorney]: Move to strike.
THE COURT: What?
MR. COHN: The information.
THE COURT: Do you want me to highlight it or not?
MR. COHN: I move to strike, yes, and tell the jury
they should disregard.
[The sidebar ended.] * * *
THE COURT: Ladies and gentlemen, there was a statement regarding a number with the police department. You will strike that from your minds and strike it from the testimony. Do not even consider that."
Given the trial court's immediate and strong admonishment to the jury to "strike" and "not even consider" the comment, we cannot say that the contested phrase constituted such a grave error that it infected the fundamental fairness of the trial. We believe that the prompt and strong admonition by the trial court sufficiently cured any improper inference that the jury may have momentarily drawn. Accordingly, we find that the trial court did not abuse its discretion in denying defendant's motion for a mistrial.
Second, defendant asserts that the imposition of consecutive sentences under the mandatory consecutive sentencing provision was improper. Defendant also argues that the consecutive sentences in this case constituted impermissible double enhancement.
Section 5-8-4(a) of the Unified Code of Corrections mandates consecutive sentences in certain circumstances:
"The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury * * * in which event the court shall enter sentences to run consecutively." 730 ILCS 5/5-8-4(a) (West 1994).
This statutory scheme dictates that consecutive sentences be imposed where (1) one of the offenses was a Class X or Class 1 felony, and (2) the defendant inflicted severe bodily injury. People v. Arna, 168 Ill.2d 107, 112, 212 Ill.Dec. 963,658 N.E.2d 445 (1995).
In the present case, there is no disagreement that since the element of severe bodily injury is inherent in the offense of first degree murder, the conviction that triggered the imposition of consecutive sentences was defendant's conviction of attempted murder. Attempted murder is subject to a Class X sentence and, therefore, satisfies the first triggering element of the consecutive sentencing statute. People v. Johnson, 149 Ill.2d 118, 159, 171 Ill.Dec. 401, 594 N.E.2d 253 (1992). A gunshot wound can satisfy the second triggering element, which requires severe bodily injury. Johnson, 149 Ill.2d at 159, 171 Ill.Dec. 401, 594 N.E.2d 253 (the victim of attempted murder suffered a gunshot wound to the shoulder).
The record reveals that the trial court initially sentenced defendant to two concurrent terms in prison, i.e., 45 years for murder and 30 years for attempted murder. In its initial sentence, the trial court addressed several factors in aggravation regarding the attempted murder and found that defendant "didn't cause serious harm to Anthony Baggett." The trial court expressly found that consecutive sentences were not required because attempted murder is not a Class X felony. Upon the State's motion to reconsider the sentence, the trial court acknowledged that it had "erred in * * * finding that attempt murder [was] not a Class X felony." In light of this error and upon further review of the applicable statute and case law, the trial court found that the shooting of Baggett in the chest "certainly was severe bodily injury" and that the sentences "are mandated to be consecutive." The trial court then reduced the number of years in prison for each offense. The trial court imposed consecutive sentences, reducing the murder sentence from 45 to 40 years and the attempted murder sentence from 30 years to 20 years.
It is well established that the trial court is the proper forum to decide sentencing issues and its decision is entitled to great *54 deference. People v. Coleman, 166 Ill.2d 247, 258, 209 Ill.Dec. 782, 652 N.E.2d 322 (1995). Absent an abuse of discretion, a sentence within the statutory limits will not be disturbed on appeal. Coleman, 166 Ill.2d at 258, 209 Ill.Dec. 782, 652 N.E.2d 322. "When consecutive sentences are imposed pursuant to the law and are supported by the record, they will not be reversed on review." People v. Lopez, 228 Ill.App.3d 1061, 1077, 170 Ill.Dec. 758, 593 N.E.2d 647 (1992).
In light of the mandatory consecutive sentencing provision and its proper application to the present case, we will not reverse the trial court's imposition of consecutive sentences. Moreover, where consecutive sentences are mandated under section 5-8-4, a sentence that does not conform to its dictates is void. Arna, 168 Ill.2d at 113, 212 Ill.Dec. 963, 658 N.E.2d 445; People v. Moreland, 292 Ill.App.3d 616, 226 Ill.Dec. 814, 686 N.E.2d 597 (1997).
In addition, we reject defendant's double enhancement argument based on People v. Miller, 193 Ill.App.3d 918, 142 Ill.Dec. 247, 552 N.E.2d 988 (1989). The Miller court found that consecutive sentences could not be imposed for two convictions for voluntary manslaughter (Class 1 felonies) because the offense of voluntary manslaughter requires a death and, therefore, the element of severe bodily injury (death) is inherent in the offense. Miller, 193 Ill.App.3d at 930, 142 Ill.Dec. 247, 552 N.E.2d 988. Under this rationale, the Miller court found that the element of severe bodily injury could not be used to further enhance the penalty through the consecutive sentencing statute. Miller, 193 Ill.App.3d at 930, 142 Ill.Dec. 247, 552 N.E.2d 988. In the present case, however, the triggering offense for purposes of the mandatory sentencing provision is attempted murder, not first degree murder, and, thus, there is no double enhancement issue regarding the first degree murder conviction. See People v. Porter, 277 Ill.App.3d 194, 198-99, 213 Ill.Dec. 861, 660 N.E.2d 118 (1995) (and cases cited therein, criticizing and distinguishing Miller).
Third, defendant asserts that he is entitled to sentencing credit against each of his consecutive sentences, i.e., the 40-year sentence for murder and the 20-year sentence for attempted murder. The trial court awarded defendant 651 days' credit for time served during the course of his case. The revised mittimus states "credit for time served of (651) days."
The districts that have considered this issue have come to contrary conclusions. In People v. Johnson, 286 Ill.App.3d 597, 601, 222 Ill.Dec. 76, 676 N.E.2d 1040 (1997), the second district held that the defendant was entitled to separate credit against each of his four consecutive sentences based on the supreme court's decision in People v. Robinson, 172 Ill.2d 452, 217 Ill.Dec. 729, 667 N.E.2d 1305 (1996).
Subsequently, the fourth and fifth districts expressly declined to follow Johnson and its interpretation of Robinson. People v. Plair, 292 Ill.App.3d 396, 226 Ill.Dec. 679, 686 N.E.2d 28 (1997); Feazell v. Washington, 291 Ill.App.3d 766, 226 Ill.Dec. 56, 684 N.E.2d 1052 (1997). The courts in Plair and Feazell held that a defendant is not entitled to more than single credit for his time served against his consecutive sentences. As discussed in Plair and Feazell, the Robinson case did not involve or address either consecutive sentences or the consecutive sentencing provision, i.e., section 5-8-4(e) of the Unified Code of Corrections (730 ILCS 5/5-8-4(e) (West 1994)).
Section 5-8-4(e) governs the credit granted where consecutive sentences are imposed:
"(e) In determining the manner in which consecutive sentences of imprisonment * * * will be served, the Department of Corrections shall treat the offender as though he had been committed for a single term with the following incidents:
* * * * * *
(4) the offender shall be awarded credit against the aggregate maximum term and the aggregate minimum term of imprisonment for all time served in an institution since the commission of the offense or offenses and as a consequence thereof * * *." (Emphasis added.) 730 ILCS 5/5-8-4(e) (West 1994).
*55 The plain language of this statute means that consecutive sentences are to be treated as a single term and credit against that single term can be applied only once to the whole. Feazell, 291 Ill.App.3d at 768, 226 Ill.Dec. 56, 684 N.E.2d 1052. To grant a defendant separate credit against each of his consecutive sentences in effect would award double credit. Plair, 292 Ill.App.3d 396, 226 Ill.Dec. 679, 686 N.E.2d 28.
Significantly, the Robinson decision did not involve consecutive sentences and neither Robinson nor Johnson even mentioned section 5-8-4(e), the consecutive sentencing provision. In contrast, the courts in both Feazell and Plair were faced with consecutive sentences and discussed the relevant statutory provision. We elect to follow the holding and reasoning in Feazell and Plair and, therefore, find that the trial court properly declined to award credit against each separate consecutive sentence.
For all of the foregoing reasons, we affirm the defendant's convictions and sentences.
Affirmed.
ZWICK and QUINN, JJ., concur.