2021 IL App (1st) 191319-U

FIFTH DIVISION
JUNE 11, 2021

No. 1-19-1319

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 19991 |
| | ) | |
| WALID RAHMOUNI, | ) | Honorable |
| | ) | William V. Raines, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE CUNNINGHAM delivered the judgment of the court.
Presiding Justice Delort and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The defendant's conviction for aggravated kidnaping and sentence of 102 years' imprisonment are affirmed.

¶ 2    Following a jury trial in the circuit court of Cook County, the defendant-appellant, Walid Rahmouni, was convicted of home invasion, aggravated kidnaping, armed robbery, aggravated criminal sexual assault, and aggravated criminal sexual abuse. He was sentenced to 102 years' imprisonment. The defendant now appeals, arguing that his conviction for aggravated kidnaping cannot stand and that the circuit court erred in his sentencing. For the reasons that follow, we

affirm the judgment of the circuit court of Cook County.

¶ 3                                    BACKGROUND

¶ 4     The defendant was charged with two counts of home invasion, one count of aggravated kidnaping, one count of armed robbery, eight counts of aggravated criminal sexual assault, and two counts of aggravated criminal sexual abuse for an incident that occurred on November 7, 2015. A jury trial commenced, and the following evidence was presented.

¶ 5     A.L. testified that in November 2015, she was 21 years old and lived alone in a second-floor studio apartment on North Elston Avenue in Chicago. She was attending college at Northwestern University and working at CVS Pharmacy. On November 6, 2015, A.L.'s shift at CVS finished around 10:30 p.m. and her mother picked her up and drove her back to her apartment. Once inside her apartment, she Skyped with her boyfriend, watched television, then fell asleep at approximately 1 a.m. She testified that the weather was "nicer than normal" that night, so she slept with her windows open, although they had screens on them.

¶ 6     A.L. awoke to "a large crashing noise." She did not know how long she had been asleep before hearing the crashing noise. She did not get out of bed because she thought the sound was her cat knocking something over. Suddenly, A.L. saw a stranger standing next to her bed and looking down at her. Then the stranger got on top of her body and placed something "cold and sharp" that felt like a box cutter against her neck. A.L. screamed and the stranger told her to "shut up and that it was going to happen." In court, A.L. identified the defendant as the stranger.

¶ 7     A.L. testified that she stopped screaming and the defendant began to touch her and kiss her neck. She tried to shove the defendant away and find her phone to call for help, but she was unable to do so. The defendant remained on top of A.L. and touched her breasts and hips over her clothes

with his hands and mouth. The defendant then pulled down A.L.'s pants and underwear and inserted his finger inside her vagina. A.L. said "anything [she] could" to get the defendant to stop, including telling him that she had various sexually transmitted diseases. The defendant was undeterred. He touched her vagina with his mouth for a while and then got back on top of her. The defendant took her shirt off, kissed her breasts, and forced her to kiss him. The defendant then put his penis inside A.L.'s vagina. A.L. continued to tell the defendant "no" and "stop," but the defendant did not stop. The defendant also forced A.L. to perform oral sex.

¶ 8 The defendant led A.L. to the bathroom by forcibly grabbing her arm. He made her get into the bathtub and told her to bathe herself. The defendant found a bottle of peroxide and told her to wash herself with it. After removing her from the bathtub, the defendant took A.L.'s cell phone and made her give him the passcode to unlock it. The defendant kept the phone.

¶ 9 The defendant forced A.L. out of the bathroom and back to the bed, where he pushed her face down. The defendant then put his penis inside her anus and ejaculated. The defendant removed his penis, but then put it back inside both her anus and vagina for a while. A.L. kept asking the defendant to stop, and the defendant responded by telling her that she "liked it."

¶ 10 Eventually, the defendant stood up and told A.L. to stay down on the bed. The defendant grabbed A.L.'s laptop, went through her drawers and backpack, and removed a gold diamond ring from her finger. The defendant then went back to the window and exited A.L.'s apartment through the screen, taking with him A.L's laptop, cell phone, ring, and debit card. At that point, A.L. noticed that the window screen had been cut diagonally. After the defendant climbed out of the window, he said to A.L. "you are not going to tell on me, right if you have my kid?" A.L. told the defendant that she was not going to tell on him. A few seconds later, the defendant came back

through the window and began looking for something on the floor. A.L. noticed a key on the floor that she did not recognize and picked it up and gave it to the defendant in hopes that he would leave. The defendant grabbed the key from her and left the apartment through the window.

¶ 11    After the defendant left her apartment, A.L. slammed the windows shut, put on some clothes, and ran into her apartment hallway screaming for help. She knocked on different doors until someone answered. Finally, a man opened his front door. A.L. told him that she had been raped and he let her use his phone to call 911. The record shows that the 911 call was placed at 5:20 a.m.

¶ 12    A.L. was subsequently taken to the hospital in an ambulance. At the hospital, a rape kit was conducted. Afterwards, police officers interviewed A.L. at the hospital and showed her a photo array with a series of pictures. A.L. identified the defendant in the photo array as the stranger who broke into her apartment and raped her. A.L. did not know the defendant before that night and did not give him permission to enter her apartment.

¶ 13    Jose Zuniga testified that on November 7, 2015, he was living in an apartment on North Elston Avenue in Chicago. A little after 5 a.m., there was a knock on his front door and he opened it. He saw a "young lady" who looked "very sad." She told him that she had been raped and that "her phone had been taken away." Mr. Zuniga brought her inside his apartment and gave her his phone to call 911.

¶ 14    Heidi Ulreich, a registered nurse at Swedish Covenant Hospital, testified that in the early morning hours of November 7, 2015, A.L. was brought into the emergency room for sexual assault. Nurse Ulreich performed a rape kit on A.L. and collected anal, vaginal, and oral swabs from her. She also collected swabs from A.L.'s breasts, lower back, nose, and mouth.

¶ 15    Detective Demetrios Kolliopoulos testified that he was assigned to investigate A.L.'s sexual assault. He arrived at the scene on North Elston Avenue at approximately 6 a.m. Detective Kolliopoulos entered A.L.'s apartment and looked out the rear windows. He testified that the rear windows in A.L.'s apartment faced a flat roof of another building. He further explained that the flat roof butted up against A.L.'s apartment building and to a row of windows that led directly into A.L.'s apartment. Detective Kolliopoulos testified that he went onto the flat roof via an exterior stairwell that was not locked. A small fence separated the stairwell from the flat roof, but someone could easily "just hop over it." Detective Kolliopoulos was able to access A.L.'s apartment windows by doing so and testified that he could have easily crawled through one of her apartment windows. He saw that one of the window's screens had been cut.

¶ 16    Detective Kolliopoulos testified that when he was standing outside A.L.'s apartment windows, he observed a cell phone and an identification card laying on the flat roof. The identification card belonged to the defendant. A.L. subsequently identified the cell phone as hers.

¶ 17    Detective Charles Hernandez testified that he went to Swedish Covenant Hospital on November 7, 2015, and met A.L. in the emergency room. He showed her a photo array, which contained six photographs. A.L. identified the defendant in the photo array "almost immediately."

¶ 18    Investigator Rubin Delvalle, a member of the Chicago Police Department Fugitive Task Force, testified that he was assigned to locate the defendant. On November 17, 2015, his team located the defendant on board a Greyhound bus that was preparing to leave Chicago. The defendant was then taken into custody.

¶ 19    Brian Schoon, an expert in forensic DNA analysis, testified that he was assigned to perform DNA testing and analysis in this case. He received a blood sample from A.L., as well as samples

from the vaginal, anal, and lower back swabs from her rape kit. He also received a buccal standard swab from the defendant. The test results identified a human male DNA profile on the vaginal swabs which matched the DNA profile of the defendant and a human male DNA profile from the lower back swabs which matched the DNA profile of the defendant.

¶ 20    The State then rested. The defendant made a motion for a directed verdict, which the trial court denied.

¶ 21    The defendant testified that his family owned and operated a restaurant where he often spent his time. He testified that he occasionally met a woman at the restaurant, whom he referred to by a common abbreviation of A.L.'s first name, but he did not specifically testify that A.L. was that woman. The defendant testified that on November 7, 2015, at around 1:00 or 1:30 a.m., he met the woman at the restaurant, and then they went to her apartment next door, where they "chill[ed], smoke[d] weed," and "had sex." After they had sex, they had an argument about money. The defendant left her apartment and never spoke to her again. He denied that he had a box cutter or any weapon on him that night, and also denied that he climbed through any windows. Following his testimony, the defendant rested.

¶ 22    After closing arguments, the jury found the defendant guilty on all counts.

¶ 23    The case proceeded to sentencing. In aggravation, the State informed the trial court that the defendant had prior convictions for residential burglary and possession of a stolen motor vehicle. A.L.'s victim impact statement told the defendant that the person she used to be "died the day [he] chose to break into her apartment" and that he took her "body" and her "sanity." A.L.'s statement explained that she no longer had her apartment, job, or school program because the defendant had "sexually assault[ed] [her] for hours." A.L.'s statement said that she had become "afraid, [ ]

depressed, and [ ] forever damaged." The defendant declined to make a statement.

¶ 24    The trial court sentenced the defendant to an aggregate term of 102 years' imprisonment: 16 years for six of the aggravated criminal sexual assault counts (a total of 96 years) plus 6 years for aggravated kidnaping. The remaining counts were either merged into the other counts and/or the sentences for those counts were ordered to run concurrently. The defendant did not move to reconsider his sentence. This appeal followed.

¶ 25                                    ANALYSIS

¶ 26    We note that we have jurisdiction to consider this matter, as the defendant filed a timely notice of appeal. Ill. S. Ct. R. 603 (eff. Feb. 6, 2013); R. 606 (eff. July 1, 2017).

¶ 27    The defendant presents the following issues on appeal: (1) whether his conviction for aggravated kidnaping should be reversed; and (2) whether the trial court erred in sentencing him.

¶ 28    The defendant first argues that his aggravated kidnaping conviction cannot stand. He claims that the kidnaping in this case was incidental to the other offenses of home invasion, armed robbery, and sexual assault, and did not pose an additional danger to A.L. He accordingly requests reversal of his conviction for aggravated kidnaping.

¶ 29    We review the operative offense of aggravated kidnaping:

> "A person commits the offense of kidnapping when he or she knowingly: (1) and secretly confines another against his or her will; (2) by force or threat of imminent force carries another from one place to another with intent secretly to confine that other person against his or her will; or (3) by deceit or enticement induces another to go from one place to another with intent secretly to confine that other person against his or her will." 720 ILCS 5/10-1(a) (West 2016).

And a person commits aggravated kidnaping when he or she commits another felony upon the kidnaping victim. 720 ILCS 5/10-2(a)(3) (West 2016). A defendant should not be convicted of kidnaping where the asportation or confinement of the victim was merely incidental to another crime. *People v. Eyler*, 133 Ill. 2d 173, 199 (1989). This court has established four factors to consider when determining whether an asportation or confinement is merely ancillary to another offense, or whether it rises to the level of an independent crime of kidnaping. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225–26 (2009). These factors include: (1) the duration of the asportation or confinement; (2) whether the asportation or confinement occurred during the commission of a separate offense; (3) whether the asportation or confinement is inherent in the separate offense; and (4) whether the asportation or confinement created a significant danger to the victim independent of that posed by the separate offense. *Id.*

¶ 30    The question of whether an asportation was incidental to another crime "challenges incriminating inferences that may have been drawn by the trier of fact from the evidence," and so the correct standard of review is that which applies to a challenge of the sufficiency of the evidence. *People v. Sumler*, 2015 IL App (1st) 123381, ¶ 53. When a defendant challenges the sufficiency of the evidence, the proper standard of review is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35. A criminal conviction will not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt as to the defendant's guilt. *Id.*

¶ 31    We begin our analysis of whether the kidnaping in this case was incidental to the other offenses with the first factor, the duration of the asportation or confinement. Although A.L.

testified that she did not know precisely what time the defendant broke into her apartment, it can be reasonably inferred that the defendant confined her more than just a few minutes. A.L. fell asleep at approximately 1 a.m., she was awakened by the defendant at some point after she fell asleep, she stated that the defendant sexually assaulted her for hours, she called 911 almost immediately after the defendant left, and her call was placed at 5:20 a.m. The most logical presumption would be that the defendant confined A.L. inside her apartment for *several hours* sometime between 1 a.m. and 5 a.m. Not to mention that the defendant sexually assaulted A.L. numerous times in multiple ways, which also required a substantial amount of time. Furthermore, the defendant confined A.L. for more time than he needed to sexually assault her, including forcing her to take a bath in between the sexual assaults. See *People v. Young*, 115 Ill. App. 3d 455, 470 (1983) (the defendant's aggravated kidnaping conviction could not stand where the duration of the detention was *only* for the period of time necessary to accomplish the rape). Simply put, the duration of time for which A.L. was confined by the defendant was significant.

¶ 32    In looking at the second factor, whether the asportation or confinement occurred during the commission of a separate offense, we note that *before* the defendant began sexually assaulting and robbing A.L., he held a box cutter (or a similar weapon) against her throat, told her not to scream, and prevented her from leaving or calling for help. Moreover, *between* the episodes of sexual assaults, the defendant confined A.L. to the bathroom, forced her to take a bath, give him the passcode to her locked phone, and retained the phone. These activities are clearly not in and of themselves part of the sexual assaults, so it cannot be said that the kidnaping *only* occurred during the commission of the sexual assaults.

¶ 33    Turning to the third factor, neither the asportation nor means of confinement that occurred

were inherent in the other offenses. In order for asportation or confinement to be inherent in a separate offense, it must constitute an element of that offense. *Sumler*, 2015 IL App (1st) 123381, ¶ 59. Clearly, asportation and confinement are not elements of home invasion, armed robbery, or sexual assault.

¶ 34    Finally, we consider the fourth factor, whether the asportation or confinement created a significant danger to the victim independent of that posed by the other separate offenses. As discussed, before the defendant began sexually assaulting A.L., he held a box cutter (or a similar weapon) to her throat and threatened her. He also confined her in the bathroom and forced her to wash herself with peroxide. These acts created an independent danger to A.L. separate from the home invasion, armed robbery, and sexual assault. This is especially true, since it has been well established that an independent danger arises from the potential for more serious criminal activity due to the privacy of the location where the victim is confined. A.L.'s apartment was such that the defendant could confine her and carry out his activities without fear of interruption or discovery, which created an independent danger to A.L. See *People v. Ware*, 323 Ill. App. 3d 47, 56 (2001) (finding the difficulty in signaling for help and the diminished likelihood that a passerby would observe the victim constituted an independent danger). Thus, after weighing all four factors, it is clear that the aggravated kidnaping offense in this case was separate from the other offenses. We accordingly reject the defendant's argument and affirm his conviction for aggravated kidnaping.

¶ 35    The defendant next argues that the trial court erred in sentencing him to an aggregate term of 102 years' imprisonment. Specifically, he claims that the offenses for which he was convicted, occurred as part of a single course of conduct with no substantial change in the criminal objective and, as such, the consecutive sentencing statute's limitation on aggregate terms applies. He argues

that under the consecutive sentence statute, his maximum sentence is 80 years.

¶ 36    As an initial matter, the defendant concedes that he has forfeited this issue because he did not challenge his sentence in the trial court. See *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 16 (to preserve an issue for appeal, a defendant must object at trial and raise the issue in a posttrial motion). Nonetheless, the defendant urges us to review the issue under the plain error doctrine, which allows this court to bypass normal forfeiture principles and consider an unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. *People v. Magallanes*, 409 Ill. App. 3d 720, 727-28 (2011). The first step under either prong of the plain error doctrine is to determine whether a clear or obvious error occurred at trial. *People v. Anaya*, 2017 IL App (1st) 150074, ¶ 58. We will accordingly determine if the consecutive sentence statue applies to the defendant.

¶ 37    When multiple offenses are committed in a single course of conduct during which there was no substantial change in the nature of the criminal objective, the sentence shall not exceed the sum of the maximum terms for the two most serious felonies involved. 730 ILCS 5/5–8–4(f)(2) (West 2016). The test to be used in determining whether multiple offenses were committed as part of a single course of conduct is to ask: were the defendant's acts independently motivated? *People v. Wilder*, 325 Ill. App. 3d 987, 1001 (2001). When consecutive sentences are imposed pursuant to the law and are supported by the record, they will not be reversed on review. *People v. Biggs*, 294 Ill. App. 3d 1046, 1053 (1998).

¶ 38    The defendant claims he maintained the same objective throughout the incident, which was to rob and sexually assault A.L. The facts of this case cannot support such an argument. As discussed, the defendant broke into A.L.'s apartment; held a box cutter (or a similar weapon) to

her throat to keep her confined; trapped her inside her bathroom and forced her to wash herself with peroxide; sexually assaulted her at different times in multiple ways; and robbed her. Clearly, each of these were separate acts with distinct motivations. Thus it cannot be said that there was just one criminal objective. See *People v. Perruquet*, 118 Ill. App. 3d 293, 296-97 (1983) (finding that the defendant formed separate criminal objectives where "the defendant committed two acts of rape against the victim that were separate in time and location" even though they occurred during the same day). We therefore reject the defendant's argument that his offenses were committed as part of a single course of conduct. Consequently, the trial court did not err by failing to sentence the defendant in accordance with the consecutive sentencing statute. Since there was no error, there can be no plain error.

¶ 39                                     CONCLUSION

¶ 40    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 41    Affirmed.